## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BELLWETHER ENTERPRISE REAL ESTATE CAPITAL,**<br><br>    **Plaintiff,**<br><br>**versus**<br><br>**CHRISTOPHER JAYE, ET AL.,**<br><br>    **Defendants.** | **CIVIL ACTION**<br><br>**No. 19-10351**<br>**c/w No. 19-13058**<br><br>**THIS PLEADING RELATES TO CIVIL ACTION NO. 19-10351**<br><br>**Section "F"**<br><br>**Judge Martin L.C. Feldman**<br><br>**Magistrate Judge Janis Van Meerveld** |

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT BY DEFENDANTS CHRISTOPHER JAYE AND KRISTI MORGAN**

Christopher Jaye ("Jaye") and Kristi Morgan ("Morgan"), Defendants in Civil Action No. 19-cv-10351,[1] respectfully submit this memorandum in support of their joint motion for partial summary judgment. The captioned proceeding arises out of a project to build affordable housing in New Orleans East. Plaintiff Bellwether Enterprise Real Estate Capital ("Bellwether") loaned money to Mirus New Orleans, LLC ("Mirus") to construct the project. In connection with that loan Mirus, Jaye, and Morgan, as obligors, and Bellwether, as lender, executed a document entitled "Extension Fee Agreement" ("EFA"), which Bellwether seeks to enforce. More specifically, Bellwether seeks a judgment allowing it to recover "extension fees" in excess of $400,000 due to

---

[1] Morgan and Jaye are collectively referred to herein as "Defendants."

delay in achieving "final endorsement" of the loan by the federal Department of Housing and Urban Development ("HUD").[2]

In their motion, Jaye and Morgan request a declaratory judgment against Bellwether holding that the EFA is null, void, and unenforceable under Louisiana law, as well as dismissal of Bellwether's claim for relief under the EFA. Summary judgment is appropriate because the "extension fees" Bellwether seeks to recover are, in actuality, impermissible penalties. The so-called "extension fees" do not actually buy an extension, and are wholly untethered from any actual delay damages Bellwether could have reasonably anticipated at the time of contract. Under the plain terms of the EFA and applicable Louisiana law, the EFA's "Penalty Provision" is unenforceable—and summary judgment is warranted—for several reasons.

*First*, the EFA's Penalty Provision on its face is unlawfully punitive. Under Louisiana law, stipulated-damages provisions must attempt to ***approximate anticipated damages*** in the event of a breach. Here, it is plain that the Penalty Provision does not approximate anticipated compensatory damages. There is no contractual language tying the monthly extension fees to actual anticipated damages whatsoever. Instead, the Penalty Provision imposes a formulaic percentage penalty that ***doubles*** after three months. Further, the EFA recites that it exists "for the purpose of inducing Bellwether" to make the Loan—not for the purpose of ***compensating*** Bellwether for, *e.g.*, payments made to investors in the event final endorsement was delayed. And, critically, the EFA Penalty Provision amounts are in addition to, not a substitute for, recovery of actual damages attributable to delay.

---

[2] As discussed in greater detail below, Bellwether has billed Mirus "extension fees" of $433,847 of which Mirus has paid $78,881. Bellwether endeavors to keep the paid amount and recover the unpaid balance from Defendants and/or Mirus.

***Second***, while summary judgment can be granted on the "four corners" of the EFA, extrinsic evidence confirms the punitive nature of the EFA Penalty Provision. At no point prior to the signing of the EFA did any Bellwether representative attempt to justify the Penalty Provision to Mirus as an estimate of the damages Bellwether would incur in the event that final endorsement was delayed. Indeed, Bellwether could not make such a representation because their actual damages—payments due to their investor—were known at the time the EFA was executed ***and*** were far less than the amounts assessed under the EFA. Moreover, Bellwether has admitted it was not until November 2018—two years after the EFA was executed—that Bellwether first communicated that the Penalty Provision was designed to recoup payments that it would make to its investor. In addition, Bellwether has admitted that it has used the ***exact same extension-fee formula*** in at least ***sixteen*** other loans of widely varying dollar amounts—demonstrating that it imposes these fees as a uniform default unconnected to any loan-specific anticipated damages. In view of all this, the Penalty Provision is plainly unenforceable under Louisiana law.

***Third***, even if the Penalty Provision were not construed as being unlawfully punitive at this juncture, declaratory relief is still appropriate for the independent reason that Bellwether did not place Mirus, Jaye, and Morgan in default for the delay in achieving final endorsement—as it was required to do by law in order to recover stipulated damages.

For these reasons and those explained below, the Court should enter partial summary judgment in favor of Jaye and Morgan against Bellwether.

## BACKGROUND

While the basis of Defendants' motion for partial summary judgment is largely legal in nature, the facts pertinent to the motion are not in dispute.

## I.      The Project and Loan.

Mirus is the owner of the Village of Versailles Project (the "Project"), which was funded, in part, by a commercial mortgage loan issued by Bellwether on July 1, 2016 (the "Loan"). Statement of Uncontested Material Facts ("SUMF") ¶ 1. The Project is the first new affordable housing development built in New Orleans East since Hurricane Katrina. *Id*., ¶ 3. The Loan is memorialized in multiple documents, including a Mortgage Note dated July 1, 2016, a Building Loan Agreement dated July 1, 2016, a Regulatory Agreement, and other documents. *Id*., ¶ 4. The Project financing was insured by the federal Department of Housing and Urban Development ("HUD") under Section 221(d)(4) of the National Housing Act, as amended. *Id*., ¶ 5. The final advance of proceeds of the Loan was expected to be made by Bellwether at the time of final endorsement of the Note for insurance by HUD ("Final Endorsement"). *Id*., ¶ 10.

## II.     The Extension Fee Agreement.

### A.      The Penalty Provision.

Defendants and Mirus, as obligors, and Bellwether, as lender, executed an Extension Fee Agreement during the July 1, 2016 Loan closing. The EFA contains a delay penalty as follows:

> 1. Extension Fees. (a) Obligor agrees that ***in the event that Final Endorsement has not occurred on or before*** August 31, 2018, Obligor shall be liable and obligated to pay to Lender a monthly extension fee (the "Extension Fee") equal to (i) 1/8th of one percent (0.125%) of the original face amount of the FHA Mortgage Note for each "Monthly Period" (as defined below) or portion thereof, commencing on September 1, 2018 and continuing through November 31, 2018 then increasing to (ii) 1/4 of one percent (0.25%) of the original face amount of the FHA Mortgage Note for each Monthly Period or portion thereof, commencing December 1, 2018 and continuing until Final Endorsement.

EFA § 1(a) (emphasis added).[3] The "fees" are not stated to be in lieu of delay damages that would be difficult to ascertain. Rather, the EFA states it is made "for the purpose of inducing Lender to make the Mortgage Loan." *Id.* at 1.

**B.      The EFA's non-exclusive and double-recovery damages.**

In addition to the foregoing Penalty Provision, the EFA allows recovery of "any and all" compensatory damages in the event of that Final Endorsement did not occur by fixed dates. Section 2 of the EFA provides that "[i]n the event that Final Endorsement has not occurred on or before December 1, 2018, Obligor shall be liable to Lender . . . for any and all costs, expenses, charges, fees ***and damages*** incurred in connection with" the repurchase, remarketing, sale, or holding of GNMA securities. These damages are facially ***in addition to*** the Penalty Provision's escalating delay penalties based on fixed percentages of the Mortgage Note face amount. EFA § 1(a). The EFA also attempts to reserve further relief for Bellwether. *See* EFA § 1(c) (penalties "shall be ***in addition to*** the rights and remedies give [sic] to Lender in any other documents . . . ." (emphasis added)).

**III.      Final Endorsement and Bellwether's invoicing for penalties.**

Final Endorsement did not occur by August 31, 2018. SUMF ¶ 11. On September 11, 2018, the contractor on the Project, Broadmoor, LLC ("Broadmoor"), filed a Sworn Statement of Amount Due in the mortgage records of Orleans Parish, Louisiana.[4] On September 24, 2018, Broadmoor filed an Amended Sworn Statement of Amount Due in the mortgage records of Orleans

---

[3] The EFA is attached to Bellwether's Complaint (ECF 1) as Exhibit A, and the document is admitted to by Jaye and Morgan.  *See* ECF 28 at 3, ¶ 10.

[4] Instrument No. 2018-35567, MIN 1283094.

Parish, Louisiana.[5] Four days later, Broadmoor filed a Complaint against Mirus, Bellwether, HUD, and CREA Corporate Tax Credit Fund 40, LLC, alleging, among other things that Bellwether and Mirus failed to comply with certain Project agreements. *Broadmoor, LLC v. Mirus New Orleans, LLC, et al.*, No. 18-09064 (E.D. La. Sept. 28, 2018) (the "Broadmoor Federal Litigation").[6] On March 25, 2019, Bellwether filed a joint Stipulation of Dismissal with Prejudice in the Broadmoor Federal Litigation. Civil Action No. 18-09064, ECF No. 30. Final Endorsement occurred on March 22, 2019. SUMF ¶ 14.

On or about September 1, 2018, Bellwether invoiced Mirus an "extension fee" of $39,441.00, which sum is "1/8th of one percent (0.125%) of the original face amount of the FHA Mortgage Note." SUMF ¶¶ 15–16. Mirus paid this penalty assessment. SUMF ¶ 17. On or about October 1, 2018, Bellwether again invoiced Mirus an "extension fee" of $39,441.00, which penalty assessment Mirus paid. SUMF ¶¶ 19–21. A third penalty assessment of $39,441.00 was invoiced by Bellwether in November, but this time Mirus refused to pay it. SUMF ¶¶ 23–25.

Beginning in December 2018, Bellwether invoiced Mirus for an "extension fee" of $78,881.00, which sum is "1/4 of one percent (0.25%) of the original face amount of the FHA Mortgage Note." SUMF ¶¶ 27–28. Mirus refused to pay this penalty assessment. SUMF ¶ 29. Bellwether invoiced Mirus penalty assessments in the amount of $78,881.00 in each of the months of January, February, and March 2019, but Mirus refused to pay them. SUMF ¶¶ 31–33, 35–37, 39–41.

---

[5] Instrument No. 2018-37167, MIN 1283926.

[6] At the time the Broadmoor Federal Litigation was filed, a suit by Broadmoor against Mirus was already pending in the Civil District Court for Orleans Parish, Louisiana. *Broadmoor, L.L.C. v. Mirus New Orleans, LLC*, No. 17-12470 (filed December 29, 2017) (the "Broadmoor State Litigation").

Bellwether has maintained that the extension fees it invoiced are not penalties, but rather "used to pay investors in a securitized loan the interest they expected to make when investing in the loan."[7] ECF 29-6 at 14.[8] Discovery responses by Bellwether, however, establish that it has only made three (3) payments of $39,440.13 (a total of $118,323.39) to its investor as it maintains entitlement to $433,847.00 of "extension fees."[9]

## IV.    Procedural history.

Bellwether filed its Complaint against Defendants on May 13, 2019, bringing one claim for breach of contract. ECF 1. Defendants filed their answer, affirmative defenses, and counterclaims to Bellwether's Complaint on September 27, 2019 (ECF 26), and filed an amended answer, affirmative defenses, and counterclaims on October 9, 2019 (ECF 28). As relevant here, Defendants asserted a counterclaim for declaratory judgment on the basis that the extension fees set forth in the EFA's Penalty Provision are "manifestly unreasonable, contrary to public policy, and invalid and unenforceable under Louisiana law because they are neither reasonable nor compensatory." *Id.* at 14.

Mirus filed its own Complaint against Bellwether on October 8, 2019, bringing claims for, *inter alia*, (1) declaratory judgment that the Penalty Provision is invalid and unenforceable under Louisiana law and (2) payment of a thing not owed. *See* Case No. 19-13058, ECF 1. The Court consolidated the actions. ECF 32.

---

[7] This justification for the "extension fees" does not exist in the EFA.

[8] Unless otherwise indicated, ECF references are to pleadings filed in Civil Action No. 19-cv-10351, and page references are to the ECF page number.

[9] Ex. D, Bellwether's Supplemental Responses to Mirus's First Set of Interrogatories at 5 (Int. No. 17).

Bellwether moved to dismiss Defendants' counterclaims on October 23, 2019 (ECF 29), and moved to dismiss Mirus's Complaint on November 19, 2019 (Consolidated ECF 34). On December 11, 2019, the Court denied both Bellwether motions in relevant part. Consolidated ECF 44 (Jaye and Morgan), 45 (Mirus). In particular, the Court held that Jaye, Morgan, and Mirus "have stated a claim for a declaratory judgment that the extension fee agreement is unenforceable" under Louisiana law because the extension fees are not compensatory. ECF 44 at 14; ECF 45 at 15.

## LEGAL STANDARD

This Court is more than familiar with the legal standards governing motions for summary judgment under Fed.R.Civ.P. 56, and Defendants will not belabor the Court with a general recitation of those standards. To the extent any citation to authority is necessary, Defendants adopt this Court's thorough enunciation of the summary judgment standard in *Doe v. Loyola Univ.*, No. 18-6880, 2020 U.S. Dist. LEXIS 36129, at *12 (E.D. La. Mar. 3, 2020) (Feldman, J.).

Moving past the well-accepted summary judgment standard, Defendants would remind the Court that summary judgment is particularly appropriate in cases involving the construction of unambiguous contract language. *Sher v. Lafayette Ins. Co.,* 07-2441, 988 So. 2d 186, 192 (La. 07/07/08); *see also Semco, LLC v. Grand Ltd.*, 16-342, 221 So. 3d 1004, 1035 (La. App. 5 Cir. 5/31/17) ("Interpretation of a contract and, specifically the issue of whether a contract is ambiguous, is a question of law properly determined at the summary judgment stage."). When the words of the contract are clear and unambiguous, a court must enforce the agreement as written. *Sher*, 988 So. 2d at 193. Moreover, where a contract is clear, no further interpretation may be made in search of the parties' intent beyond the four corners of the document; nor can this intent cannot be explained away or contradicted by extrinsic evidence. *See, e.g.*, *Shocklee v. Mass. Mutual Life Ins. Co.*, 369 F.3d 437, 440 (5th Cir. 2007).

**ARGUMENT**

This case largely turns on whether the EFA's Penalty Provision is enforceable under Louisiana law.[10] It is not. The unambiguous terms of the EFA demonstrate that the Penalty Provision is purely a vehicle for Bellwether to recover punitive, as opposed to compensatory, damages—meaning that the provision should be deemed unenforceable without recourse to extrinsic evidence. But even if parol evidence is considered, Mirus's position is further validated. Bellwether cannot reasonably dispute that the Penalty Provision does not attempt to approximate actual damages. Finally, and independently, declaratory relief precluding Bellwether from seeking payment of extension fees is warranted even if the Penalty Provision were in reality a permissible stipulated-damages provision. This is because Bellwether never placed Jaye, Morgan, or Mirus in default for failing to achieve Final Endorsement by August 31, 2018—a fundamental prerequisite to seeking stipulated damages. The Court should enter summary judgment in favor of Jaye and Morgan's claim for declaratory relief[11] and against Bellwether's claim for relief under the EFA.

**I.    The EFA's Penalty Provision is invalid on its face.**

The text of the EFA itself demonstrates that the Penalty Provision is not enforceable. Louisiana distinguishes stipulated-damages provisions that genuinely attempt to approximate hard-to-measure compensatory damages (enforceable) from penalty provisions that make no such

---

[10] "Jurisdiction is based on diversity, so the Court applies Louisiana 'substantive law.'" ECF 45 at 7. Here, Louisiana's substantive choice-of-law rules require the Court to honor the EFA's Louisiana choice-of-law provision. *Id.*; *see also* EFA § 5(d).[11] The Declaratory Judgement Act provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

[11] The Declaratory Judgement Act provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

attempt (unenforceable). "Parties may stipulate the damages to be recovered in case of nonperformance, defective performance, or delay in performance of an obligation," which "gives rise to a secondary obligation for the purpose of enforcing the principal one." La. Civ. Code art. 2005. To be enforceable, however, stipulated damages must be adequately tied to the amount of anticipated compensatory damages. *Util. Constructors, Inc. v. Perez*, No. 15-4675, 2016 U.S. Dist. LEXIS 138271, at *19 (E.D. La. Oct. 5, 2016). *See also* La. Civ. Code art. 2005, Cmt. (c) (stating that "[a] stipulated damages clause is given effect ***if*** the court deems it to be a ***true approximation of actual damages***" (emphases added)).

Courts need not consider extrinsic evidence of party intent in assessing whether a particular damages provision amounts to an unlawful penalty. Rather, the traditional rules of contract interpretation apply. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "Testimonial or other evidence may not be admitted to negate or vary the contents" of an unambiguous contract. La. Civ. Code art. 1848. *See also Delta Rault Energy 110 Veterans, L.L.C. v. GMAC Commer. Mortg. Corp.*, No. 04-139, 2004 U.S. Dist. LEXIS 15136, at *8 (E.D. La. Aug. 3, 2004) ("Parol evidence may not be admitted to determine the intent of the parties when a contract is clear and unambiguous." (applying Louisiana law)). In short, "when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law." *Prejean v. Guillory*, 10-740, 38 So. 3d 274, 279 (La. 7/2/10) (explaining that "[t]he reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed"). Straightforward application of these principles to the EFA shows that the Penalty Provision plainly

does not fall within Louisiana's safe-harbor for stipulated damages that reasonably approximate anticipated compensatory damages.

### A. The Penalty Provision is punitive on its own terms.

The EFA's Penalty Provision itself features the hallmarks of punitive, rather than compensatory, stipulated damages. Consider first the manner in which the Penalty Provision calculates the "monthly extension fee[s]." The monthly fee amounts are not recited to be a reasonable approximation of actual or anticipated compensatory damages in the event of a delay in Final Endorsement, nor could they. Instead, the Penalty Provision imposes a formulaic monthly penalty of 0.125% of the Note amount in the event that Final Endorsement did not occur by August 31, 2018. EFA § 1(a). There is no contractual language tying this monthly fee to any anticipated or actual damages whatsoever. Indeed, the provision does not even reference in the abstract what harm it is trying to estimate. *See John Jay Esthetic Salon, Inc. v. Woods*, 377 So. 2d 1363, 1367–68 (La. App. 4 Cir. 1979) ("True liquidated damages represent an amount, arrived at in a good faith effort by the parties at the time of contracting, to reasonably estimate the monetary loss which will probably be sustained in the event of a breach.") (holding liquidated damages provision unenforceable as a matter of law where, on the face of the contract, the damages were "simply not reasonably related to the probable actual damages").

Revealingly, that initial monthly extension fee automatically ***doubles*** in the event that Final Endorsement is delayed past November 31, 2018—without any attempt to explain how this escalation approximates actual compensatory damages. EFA § 1(a) (increasing from 0.125% of Note amount to 0.25% of Note amount). Further, as drafted, this heightened monthly penalty could conceivably extend into ***perpetuity***. EFA § 1(a) (imposing heightened fee "continuing until Final Endorsement").

The non-compensatory nature and unreasonableness of the 0.125% penalty and the 0.25% penalty—including whether each individual monthly penalty constitutes an approximation of actual or anticipated damages for the corresponding month—must be separately considered. This is because the Penalty Provision contains a conjunctive obligation under the Civil Code that imposes multiple items of performance that may be separately rendered or enforced. La. Civ. Code art. 1807 ("An obligation is conjunctive when it binds the obligor to multiple items of performance that may be separately rendered or enforced. In that case, *each item is regarded as the object of a separate obligation*." (emphasis added)).[12] Neither the initial penalty of 0.125% nor the 100% increase in penalty to 0.25% is an approximation of any compensatory loss by Bellwether for the corresponding month. *See Mobley v. Mobley*, 37364 (La. App. 2 Cir. 08/20/03); 852 So. 2d 1136, 1139 (explaining that a stipulated damages clause "is not a vehicle for recovery of punitive damages, as opposed to compensatory damages").

The EFA even goes so far as to impose penalties for the nonoccurrence of Final Endorsement irrespective of whether Bellwether agrees to provide any extension. EFA § 1(b) ("Lender's right to charge and receive fees for extending the date of Final Endorsement shall not be construed to give [Mirus] the right to any extension. The Obligor acknowledges that *Lender is not obligated to grant any extensions by reason of this Agreement* . . . ." (emphasis added)). Stated differently, the EFA imposes absolute and formulaic penalties "in the event that Final Endorsement has not occurred" by certain fixed dates, and purports to absolve Bellwether of any corresponding obligation to grant any extension. Thus, on the face of the EFA, Bellwether could refuse an extension yet collect penalty payments even in the absence of any actual damages.

---

[12] *See, e.g.*, *Latter v. State*, 621 So. 2d 1159 (La. App. 1 Cir. 1993) (lessee's obligation under a lease to make monthly installment payments was conjunctive under Article 1807; "In such case, each item is regarded as the object of a separate obligation.").

Given all this, it is unsurprising that another federal district court recently granted summary judgment declaring a nearly identical agreement unenforceable under analogous state law. *See Crossland v. Oppenheimer Multifamily Hous. & Healthcare Fin., Inc.*, No. CIV-16-1218-M, 2018 U.S. Dist. LEXIS 109315 (W.D. Okla. June 28, 2018).[13] *Crossland* involved a HUD-insured loan by defendant Oppenheimer to an entity owned by plaintiffs Crossland and Marrone for an apartment rehabilitation project. Oppenheimer, Crossland, and Marrone executed an "Extension Discount Agreement" remarkably similar to the EFA in this case, which provided:

> [Crossland and Marrone] have agreed that, *in the event that Final Endorsement* for Mortgage Insurance of the Note for the Project by HUD (hereinafter referred to as "Final Endorsement") *does not occur on or before the Required Final Endorsement Date* . . . then [Crossland and Marrone] shall be obligated to pay and shall pay to [Oppenheimer], on or before the first day of the month in which such extension period commences, a monthly extension discount equal to *one-eighth of one percent* of the Insured Mortgage Amount per month (or any portion thereof) for each of the first three monthly extensions and then *one-quarter of one percent for each month* thereafter following the above-defined Required Final Endorsement Date until Final Endorsement occurs. [Crossland and Marrone] shall pay each such monthly extension discount in advance of the first day of the month in which such extension period commences.

*Id*. at *4 (emphases added). Between October 2015 and October 2016, a total of $134,130.45 in extension fees was incurred. *Id*. Crossland, the borrower, filed an action seeking declaratory relief that, *inter alia*, the extension fees under the Extension Discount Agreement were an unenforceable penalty. Both Crossland and Oppenheimer moved for summary judgment.

---

[13] The *Crossland* court applied Oklahoma law, which, like Louisiana law, requires liquidated damages to be a "reasonable estimate of probable damages or [] reasonably proportionate to the actual damage sustained at the time of the breach." 2018 U.S. Dist. LEXIS 109315 at *7–8 (citations omitted). In Louisiana, similarly, stipulated damages must "approximate the actual damages" caused by a failure to perform, *Perez*, 2016 U.S. Dist. LEXIS 138271, at *17–18, and must represent "a reasonable approximation of the foreseeable damages that a failure to perform by one party would cause to the other party." *Id*. (citing 6 La. Civ. L. Treatise, *Law of Obligations* § 13.18 (2d ed.)).

The court held that the "extension fees" constituted penalties and were not "any reasonable estimate of the expenses it would incur from carrying the loan beyond the final endorsement deadline." *Id*. at *9. The court found "the only reasonable conclusion is that the extension fees were meant to be a penalty for failing to have HUD's final endorsement by the deadline." *Id*. at *10. The court granted summary judgment for the borrower and found the extension fees void. *Id*.[14] The same result should obtain here.

Lastly, another feature of the Penalty Provision confirms its punitive, unenforceable nature. The EFA recites that the agreement is "for the purpose of inducing Bellwether" to make the Loan— not for compensating Bellwether for, *e.g.*, payments made to investors in the event Final Endorsement was delayed. EFA at 1. Once again, *Crossland* is instructive. There, too, the extension agreement provided that it was made "***for the purpose of inducing [the lender] to make the mortgage loan***"—"***not to compensate [the lender]*** for the risks and expenses of carrying the loan beyond the Final Endorsement deadline." 2018 U.S. Dist. LEXIS 109315, at *9. Thus, despite the lender's assertion that the fees would be used to pay to third-party investors, the *Crossland* court held that the "extension fees" were not compensatory. The EFA in this case should be interpreted likewise. The Penalty Provision is punitive on its own terms and is thus unenforceable as a matter of law.

**B.      The Penalty Provision is punitive in light of the EFA's separate compensatory provision.**

The Penalty Provision does not stand alone in the EFA. And under Louisiana law, "each provision in a contract must be interpreted in light of the other provisions so that each is given the

---

[14] The court also noted that the borrower "continued to make principal and interest payments on the Note beyond the final endorsement deadline." *Crossland*, 2018 U.S. Dist. LEXIS 109315, at *9–10. Here, there is no contention that Mirus failed to make a single payment due on the Note.

meaning suggested by the contract as a whole." *Prof'l Fluid Servs., LLC v. Norsk Bronnservice AS*, 17-920 (La. App. 3 Cir. 04/25/18); 245 So. 3d 47, 51. Here, the punitive quality of the Penalty Provision is brought into even sharper focus when it is juxtaposed against another provision that expressly provides for compensatory delay damages.

Section 2 of the EFA provides that "[i]n the event that Final Endorsement has not occurred on or before December 1, 2018, [Mirus] shall be liable to [Bellwether] . . . for **any and all** costs, expenses, charges, fees **and damages** incurred in connection with" the repurchase, remarketing, sale, or holding of GNMA securities. EFA § 2 (emphases added). In other words, under the plain terms of the EFA, the Penalty Provision's penalties are unequivocally **in addition to compensatory damages** available in the event of a delay in Final Endorsement. Thus, the EFA purports to make obligors responsible for both the penalty set forth in section 1(a) and actual damages arising out of delay in Final Endorsement. This it cannot do under Louisiana law. *See Util. Constructors, Inc. v. Perez*, No. 15-4675, 2016 U.S. Dist. LEXIS 138271, at *18 (E.D. La. Oct. 5, 2016) ("[P]arties may not avail themselves of a stipulated damages clause as a subterfuge to allow either one or both of them the recovery of damages that are punitive rather than compensatory." (quoting 6 La. Civ. L. Treatise, Law Of Obligations § 13.17 (2d ed.) (citing *Mason v. Coen*, 449 So. 2d 1195 (La. App. 2d Cir. 1984)).[15]

---

[15] It is of no moment for interpretive purposes that Bellwether chose to peg the compensatory provision of section 2 to delayed Final Endorsement beginning December 1, 2018 and bifurcated the Penalty Provision of section 1 between periods beginning September 1, 2018 and December 1, 2018. The critical point is that the broad-based compensatory nature of section 2 ("any and all . . . damages") is in addition to penalty damages, and sheds light on the penal nature of section 1, which bears no connection to actual damages whatsoever. If anything, the post-December 2018 overlap between the compensatory and punitive provisions simply renders section 1 of the EFA *especially* unenforceable as to that period.

Indeed, the EFA repeatedly distinguishes between Bellwether's purported penalty and compensatory rights. Pursuant to section 1(b) of the EFA, Mirus's payment of the monthly extension fees does not obligate Bellwether to grant an extension. *See* EFA § 1(b) ("[Bellwether's right to charge and receive fees for extending the date of Final Endorsement shall not be construed to give [Mirus] the right to any extension."). And under section 1(c), the EFA provides that the extension-fee rights given to Bellwether "shall be ***in addition to*** the rights and remedies give [sic] to [Bellwether] in any other documents . . . ." EFA § 1(c) (emphasis added). These imbalances not only point to the penal nature of the extension fees—as distinguished from Bellwether's other reserved compensatory rights—but also support that the extension-fee arrangement "was not supported by serious consideration." *John Jay Esthetic*, 377 So. 2d at 1368, n. 2 (concluding that liquidated damages provision was impermissibly punitive and unsupported by proportionate consideration in violation of "the civil law principle that consideration must be in proportion").

In sum, because the Penalty Provision has no stated relation to actual damages for a delay in Final Endorsement and the EFA provides multiple avenues for Bellwether to recover compensatory damages, "the only reasonable conclusion is that the extension fees were meant to be a penalty for failing to have HUD's Final Endorsement by the deadline." *Crossland*, 2018 U.S. Dist. LEXIS 109315, at *10. The Penalty Provision is punitive on its own terms and is thus unenforceable as a matter of law.

## II. Extrinsic evidence, if considered, only confirms that the Penalty Provision did not attempt to reasonably approximate actual damages.

To the extent that the Court determines extrinsic evidence is necessary to arrive at the meaning of the Penalty Provision, the result would not change. The inquiry would remain the same, only this time aided by parol evidence: "the court should inquire as to ***whether the parties attempted to approximate the actual damages*** in confecting the agreement." *Perez*, 2016 U.S.

Dist. LEXIS 138271, at *19 (quoting *Keiser v. Catholic Diocese of Shreveport, Inc.*, 38,797 (La. App. 2 Cir. 08/18/04); 880 So. 2d 230, 236 (holding a stipulated damages provision unenforceable because the clause did not reflect an attempt by the parties to approximate the actual damages) (emphasis added)).[16] "What matters is that the stipulated damages were a reasonable approximation of the foreseeable damages that a failure to perform by one party would cause to the other party." *Id.* "To determine the reasonableness, the court should inquire as to whether the parties attempted to approximate the actual damages in confecting the agreement." *Serv. Inv'rs Ltd. v. Scully*, 08-1062 (La. App. 3 Cir. 3/4/09); 9 So. 3d 910, 915 (quoting *Keiser*, 880 So. 2d at 236).

Here, there is no genuine dispute that the EFA Penalty Provision ***is not*** the result of an attempt to approximate actual damages at the time of contracting, or that the Penalty Provision ***does not***, in fact, approximate actual damages. It is undisputed that in executing the EFA the representatives of Bellwether and Mirus never once conferred or discussed that the Penalty Provision reflected an estimate of the damages Bellwether would incur in the event that Final Endorsement was delayed. *See* Ex. A, Declaration of Kristi Morgan at 3. In fact, Bellwether admits it was not until November 2018—two years after the July 1, 2016 EFA— that a Bellwether representative first communicated to Ms. Morgan that the monthly extension fees "are used, in part, to pay the GNMA investor who has counted on the loan achieving Final Endorsement at a certain point in time in calculating their yields." Ex. B, Bellwether Responses to Mirus's First Set of Interrogatories at 5 (Int. No. 6); Ex. D, Bellwether Supplemental Responses to Mirus's First Set

---

[16] *See also Serv. Inv'rs Ltd. v. Scully*, 08-1062 (La. App. 3 Cir. 3/4/09); 9 So. 3d 910, 915 ("While stipulated damage clauses are provided for in La. C.C. art. 2005, *et seq*., they should reasonably approximate the obligee's loss in the event of a breach and should not be penal. To determine the reasonableness, the court should inquire as to whether the parties attempted to approximate the actual damages in confecting the agreement") (quoting *Keiser*, 880 So. 2d at 236).

of Interrogatories at 3 (Int. No. 6) Thus, there is no genuine dispute that the Penalty Provision facially does not reflect, and factually is not the result of, an attempt by the parties to approximate actual damages.

Further, there is no genuine dispute that the Penalty Provision does not, in fact, approximate actual damages. The material factual inquiry, from a temporal standpoint, is the parties' admitted absence of any attempt to approximate actual damages *at the time of contracting*.[17] Here, it is undisputed that Bellwether knew with precision its anticipated actual damages. Before executing the EFA, on May 26, 2016, thirty-six days *before* executing the EFA, Bellwether executed a letter agreement with its investor, Lancaster Pollard & Co., Inc. ("Lancaster Pollard") relative to the mortgage backed securities used to fund the Loan. *See* Ex. C, "Trade Agreement."[18] Under this agreement, Bellwether agreed to pay Lancaster Pollard extension fees in the event of a delay in final endorsement. *See* Ex. C at 2. Bellwether admits that it made only three payments to investors in the amount $39,440.13 each in the first three months of 2019 (totaling $118,323.39). Ex. D at 5

---

[17] *See Prof'l Fluid Servs.*, 245 So. 3d at 52 ("True liquidated damages represent an amount, *arrived at in a good faith effort by the parties at the time of contracting*, to reasonably estimate the monetary loss which will probably be sustained in the event of a breach." (quoting *Woods*, 377 So.2d at 1367) (emphasis added)).

[18] The Trade Agreement is appropriately considered on summary judgment because it is capable of being presented in an admissible form at trial. "At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form." *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017). However, courts can only consider evidence that is "capable of being presented in a form that would be admissible in evidence." *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2)). To be admissible at trial, evidence must be authenticated, meaning it must be able "to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Evidence can be authenticated in various ways, including with testimony from a witness that the "item is what it is claimed to be." *Id.* 901(b). *See also Glenn v. Family Dollar Stores of La., Inc.*, No. 18-0041, 2018 U.S. Dist. LEXIS 180793, at *10-11 (W.D. La. Oct. 22, 2018). The Trade Agreement was produced by Bellwether in response to a request for production of documents, and is capable of being authenticated in a deposition or at trial by one or both of the document's signatories or by another representative of Bellwether.

(Int. No. 17) (itemizing the payments made by Bellwether to its investor for the nonoccurrence of Final Endorsement on or before August 31, 2018). Yet Bellwether is attempting to enforce seven separate penalties: three penalties in the amount of $39,441 and four penalties in the amount of $78,881, ECF 1 at ¶¶ 18–31, totaling $433,847 plus interest and untold collection costs. ECF 1 at ¶¶ 32, 38.

Notably, Bellwether admits it did not make any payment to its investor for the months of September 2018, October 2018, or November 2018.[19] When it invoiced Mirus for "extension fees" of 0.125% of the original face amount of the Note ($39,441). Bellwether did not make any payment of extension fees to Lancaster Pollard in December 2018 when it invoiced Mirus "extension fees" of 0.25% of the original Face Amount of the Note ($78,881). Thus, in the last four months of 2018 Bellwether invoiced Mirus $197,204 in "extension fees" when its actual damages (payments to investors) were *zero ($0.00)*. Because these fees are not compensatory and do not obligate Bellwether to grant an extension, they cannot be anything other than a penalty. The "extension fees" invoiced to Mirus in each of the first three months of 2019 ($78,881 per month) are *double* the actual payments made to the investor for those months ($39,440.13 per month). *Compare* Ex. D at 5 (Int. No. 17), *with* EFA § 1(a) (increasing the monthly extension fees to 0.25% of the original face amount of the Note) *and* ECF 1 ¶¶ 24–31 (asserting monthly extension fees owed of $78,881 plus interest and enforcement costs for December 2018 through March 2019). Again, because the EFA fees grossly exceed the known damages (payments contractually due Lancaster Pollard) and do not obligate Bellwether to grant an extension, they are not compensatory and merely act as a penalty for late performance. Moreover, the disparity between the EFA fees and

---

[19] Ex. D at 5 (Int. No. 17).

Bellwether's known potential damages demonstrates that the fee amounts invoiced are out of proportion relative to Bellwether's actual damages and manifestly unreasonable.[20]

Further underscoring Bellwether's failure to approximate actual damages is Bellwether's admission that it has used the ***same*** formulaic extension-fee structure in at least ***sixteen*** other loans, with loan amounts ranging from $2,025,000 to $31,290,000. *See* Ex. B at 7–8 (Int. No. 12). Bellwether further admits the formula is merely a broad-based standard used in the industry, Ex. D at 3 (Int. No. 6), and thus is not tied to the anticipated damages of a specific Project. In other words, the Penalty Provision represents a uniform extraction that Bellwether seeks from its borrowers irrespective of any damages that it anticipates to flow from delayed Final Endorsement. It does not represent an "attempt[] to approximate the actual damages in confecting the agreement." *Scully*, 9 So. 3d at 915 (affirming grant of summary judgment deeming penalty provision unlawful and unenforceable where "neither [plaintiff] nor [defendant] attempted to estimate the actual damages [plaintiff] would incur should [defendant] breach the contract when this penalty provision was agreed upon"). *See also Raj v. Tomasetti*, 07-2223 (La. App. 1 Cir. 06/06/08); 986 So. 2d 257, at *12–14 (affirming trial court's finding "that the penalty provision is void and unenforceable" where plaintiff "made no effort to demonstrate that the penalty provision was compensatory in nature or that it approximated his actual damages"—including where the provision had a "rapid escalation" provision); *In re Schwegmann Giant Super Mkts.*, 287 B.R. 649, 657 (E.D. La. 2002) (holding that a loan prepayment penalty was manifestly unreasonable under

---

[20] To appreciate how out-of-whack the Penalty Provision is with Bellwether's ***actual*** damages, the Court need look no further than Bellwether's acknowledgement that it "has not sought any payments" under section 2 of the EFA—the compensatory provision. ECF 42 at 4. Plainly, Bellwether prefers the windfall.

Louisiana law where the formula was "unrelated to the cost of the funds" that the lender had to absorb for the transaction, meaning that it was "unrelated to actual damages").[21]

Finally, that the penalties are untethered to Bellwether's anticipated actual damages is further confirmed by Bellwether's May 26, 2016 agreement with its investor, Lancaster Pollard. Ex. C, Trade Agreement. Bellwether contends that the "extension fees" set forth in the EFA were to pay its investor, Lancaster Pollard. Ex. B at 6–7, 9–10 (Int. Nos. 9, 11, 15, 17); Ex. D at 3–5 (Int. Nos. 9, 11, 17). The Trade Agreement, however, executed two months before the EFA, reveals that (1) no fee payments were owed by Bellwether to its investor from September through January 2019[22] (yet Bellwether was attempting to collect fees from Mirus for these months); and (2) the amount of the monthly fees owed by Bellwether to its investor for the months of February and

---

[21] In its answers to interrogatories, Bellwether contends that, aside from investor payments, the extension fees are also intended to cover "Bellwether staff time in excess of 115 hours devoted to the collection of extension fees." Ex. B at 6–7 (Int. Nos. 9, 11). In the first place, the parties never attempted to approximate how Bellwether's staff time displaced toward fee collection occasioned by delay of Final Endorsement figured into the extension fees as anticipated actual damages. Ex. A at 3. Yet even that fact does not capture the nonsensicalness of Bellwether's post-hac narrative. In reality, it is simply inconceivable that damages for such staff time would ever be forecast (in good faith, at least) via escalating percentages of the underlying loan amount (which amount varies wildly across the many loans on which Bellwether imposes this standardized fee structure, *see* SUMF ¶ 48). Taking Bellwether seriously would mean that it could impose the same percentage fee to cover 165 hours of "staff time" on a *$2 million* loan as it does to cover 165 staff hours on a *$32 million* loan—with both resulting, dramatically divergent amounts supposedly being "good faith" approximations of identical actual damages. To describe this position is to disprove it.

[22] The Trade Agreement provides, under the section entitled "Final Endorsement Extension Fees," that fees were not due to the investor until ***after*** the last day of the twenty-ninth anniversary of August 31, 2016 (the "delivery date"), which is ***January 31, 2019***.

March 2019, through the March 22, 2019 Final Endorsement, were 0.125% of Loan amount[23] (yet Bellwether was attempting to formulaically charge **_double_** that amount for those months).

This, of course, conclusively disproves Bellwether's unsupported assertion that the "fixed percentage of the face amount of the Note [was used] precisely because the exact calculation and itemization of every cost, expense, charge, fee and damage incurred monthly by Bellwether . . . is impractical to itemize with precision," Ex. B at 6–7 (Int. Nos. 9 and 11); Ex. D (Int. Nos. 9 and 11). *Compare Crossland*, 2018 U.S. Dist. LEXIS 109315, at *8–9 ("[Lender] further states that these expenses include extension fees that it has to pay to third party investors if a permanent loan certificate is not delivered by a certain date. The Court, thus, finds these expenses clearly are not difficult to ascertain."), *with* Ex. C, Trade Agreement, at 2 (describing with precision exact expenses Bellwether would incur if Final Endorsement and the permanent loan certificate delivery did not occur timely). In short, not only were the penalties not tied to actual anticipated damages for each of those time periods, but with the Trade Agreement having been executed two months prior to the EFA, Bellwether knew—with precision—what fees would be due its investor. Yet Bellwether chose to impose an unenforceable Penalty Provision instead.

**III. Bellwether's failure to place Defendants and Mirus in default further and independently supports summary judgment on Jaye and Morgan's claim for declaratory relief.**

Even if it remained ambiguous at this stage whether the Penalty Provision is indeed unlawfully punitive (which it is), declaratory relief precluding Bellwether from seeking to enforce payment of extension fees under the EFA would *still* be warranted because Bellwether never placed Mirus, Jaye, and Morgan in default. "An obligee may not avail himself of a clause

---

[23] *See* Ex. C, Trade Agreement, under the section entitled "Final Endorsement Extension Fees."

stipulating damages for delay unless the obligor has been put in default." La. Civ. Code art. 2010. Article 2010 "makes a putting in default a necessary pre-requisite to the recovery of stipulated damages." *Id*. cmt. (a). EFA § 1(a) unequivocally imposes a stipulated damage for delay in Final Endorsement.

Bellwether never placed Jaye, Morgan, or Mirus in default for failing to achieve Final Endorsement by August 31, 2018. *See* Ex. A at 4. Bellwether's discovery responses do not dispute this fact. In response to an interrogatory asking Bellwether to "identify each written communication in which Bellwether placed Mirus, Christopher Jaye, or Kristi Morgan in default due to Mirus' failure to achieve Final Endorsement by August 31, 2018," Bellwether tellingly demurred, responding only: "Bellwether objects to this interrogatory to the extent that it calls for a legal conclusion and on grounds of irrelevancy." Ex. B at 10 (Int. No. 18). Likewise, when asked to produce "[a]ll documents evidencing any communication by Bellwether to place Mirus, Christopher Jaye, or Kristi Morgan in default for the nonoccurrence of Final Endorsement on or before August 31, 2018," Bellwether failed to identify a single communication placing the borrowers in default, once again objecting "on grounds of relevancy." *Id.* at 20 (Req. No. 26).

Of course, this Court has already made abundantly clear that whether Bellwether placed the borrowers into default is ***dispositively*** relevant, holding that Jaye and Morgan "stated a claim for a declaratory judgment" for the very reason "that, even if the [EFA] is enforceable, Bellwether is not entitled to stipulated damages because it ***failed to place them in default***." ECF 44 n.3 (emphasis added) (citing La. Civ. Code art. 2010). Bellwether cannot genuinely dispute that it never placed the borrowers into default without "submitt[ing] evidence of contradictory facts." *Antoine v. First Student, Inc.*, 713 F.3d 824, 830 (5th Cir. 2013). Clearly, it is unable and unwilling to do so. Based on the unrebutted and unrebuttable fact that Bellwether did not place Defendants

or Mirus in default for failing to achieve Final Endorsement by August 31, 2018, summary judgment on Defendants' claim for declaratory relief is doubly warranted.

## CONCLUSION

The Penalty Provision is unlawfully punitive on its own terms, in light of the EFA's separate compensatory provision, and because it does not reflect a genuine attempt to approximate Bellwether's anticipated damages from delayed Final Endorsement. And even if the Penalty Provision were not construed as unlawfully punitive at this juncture, declaratory relief remains necessary for the separate reason that Bellwether did not place Defendants and Mirus in default— as it was required to do to seek stipulated damages. Accordingly, the Court should enter summary judgment in favor of Jaye and Morgan's claim for declaratory relief and against Bellwether's claim for relief under the EFA, which is predicated on the Penalty Provision.

Respectfully submitted,

*s/ Graham H. Ryan*
RICHARD J. TYLER (La. Bar No. 1155)
GRAHAM H. RYAN (La. Bar No. 34070)
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, LA 70170-5100
Telephone: (504) 582-8370
Fax: (504) 589-8370
Email: rtyler@joneswalker.com
Email: gryan@joneswalker.com

*Counsel for Mirus New Orleans, LLC, Christopher Jaye, and Kristi Morgan*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed via the Court's electronic filing system this 17th day of March 2020.

*s/ Graham H. Ryan*
GRAHAM H. RYAN