UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


BELLWETHER ENTERPRISE REAL ESTATE CAPITAL          CIVIL ACTION


v.                                                 NO. 19-10351

                                                   c/w 19-13058[1]


CHRISTOPHER JAYE, ET AL.                            SECTION "F"

<u>ORDER AND REASONS</u>

Before the Court are cross-motions for summary judgment. For the reasons that follow, the motions of Christopher Jaye, Kristi Morgan, and Mirus New Orleans are GRANTED and the motion of Bellwether Enterprise Real Estate Capital is DENIED.


**Background**

This contract dispute arises from a project to build affordable housing in New Orleans East and concerns, principally, a stipulated damages provision in a contract between borrowers and their lender. The borrowers say the provision is unenforceable under a Louisiana law allowing courts to modify stipulated damages that are "so manifestly unreasonable as to be contrary to public policy." LA. CIV. CODE art. 2012. The Court agrees.

---

[1] This Order applies to both consolidated cases.

Christopher Jaye and Kristi Morgan own a real estate development company called Mirus New Orleans. That company owns the Village of Versailles project—the first affordable housing development built in New Orleans East after Hurricane Katrina.

To fund the Village of Versailles project, Jaye, Morgan, and Mirus obtained a $31,552,100 commercial mortgage loan from Bellwether. The loan is insured by the United States Department of Housing and Urban Development and memorialized in a mortgage note and a building loan agreement. Under the building loan agreement, Bellwether disbursed loan proceeds upon receipt of "draw requests" from Mirus. After funding each draw, Bellwether sold GNMA mortgage-backed securities in the amount of the draw to Lancaster Pollard, an investment company.

Pivotal to the project was one date—August 31, 2018. By then, two events should have occurred: completion of construction and final endorsement. Final endorsement is when HUD approves a loan for insurance; to ensure that it occurred on time, and as a condition of the loan, Jaye, Morgan, and Mirus entered into an extension-fee agreement with Bellwether. That agreement required the borrowers to pay Bellwether a monthly "extension fee" if final endorsement did not occur by August 31, 2018:

> 1. <u>Extension Fees</u>. (a) Obligor agrees that in the event that Final Endorsement has not occurred on or before August 31, 2018, Obligor shall be liable and obligated to pay to Lender a monthly extension fee (the

"Extension Fee") equal to (i) 1/8th of one percent
(0.125%) of the original face amount of the FHA Mortgage
Note for each "monthly Period" (as defined below) or
portion thereof, commencing on September 1, 2018 and
continuing through November 31, 2018 then increasing to
(ii) 1/4th of one percent (0.25%) of the original face
amount of the FHA Mortgage Note for each Monthly Period
or portion thereof, commencing on December 1, 2018 and
continuing until Final Endorsement. In the event that
Final Endorsement shall not theretofore have occurred,
Obligor shall be obligated to pay each such monthly
Extension Fee in advance, fifteen (15) days prior to the
commencement of the applicable Monthly Period; provided
that Lender shall refund the last such monthly Extension
Fee to Obligor in the event that Final Endorsement shall
occur prior to the commencement of the applicable
Monthly Period. Thereafter, there shall be no refund of
the monthly Extension Fee. As used herein [sic] "Monthly
Period" shall mean a period starting on the first day of
a month and ending on the last day of that month.

This extension-fee agreement, Bellwether maintains,
compensates it for the losses it would suffer if final endorsement
did not occur by August 31, 2018. Those losses would allegedly
result from Bellwether's trade agreement with its investor,
Lancaster Pollard. Under that trade agreement, Bellwether had to
pay Lancaster Pollard a fee of $39,440.13——which equates to 0.125%
of the delivery amount of the $31,552,100 loan——for each month
final endorsement was delayed.

Delay ensued. The parties dispute the reason: Bellwether
points to a lawsuit the general contractor brought against Mirus
and others; the borrowers highlight Bellwether's alleged
negligence in impeding the selection of a project management agent.

Whatever the reason for the delay, it is undisputed that the general contractor on the project, Broadmoor, LLC, sued Mirus, Bellwether, and others in September 2018. <u>See</u> Eastern District of Louisiana Civil Action No. 18-9064. And it is undisputed that Broadmoor's lawsuit complicated the final-endorsement process; the Federal Housing Administration Multifamily Program Closing Guide (HUD Guide), which governs the closing of HUD-insured loans, illustrates how.

Section 1.17(A) of the HUD Guide contemplates delays caused by disputes between a borrower and a contractor, like the litigation involving Mirus and Broadmoor:

> A. <u>Disputes</u>. Occasionally, Borrower and the general contractor may have disputes regarding change orders, the quality or cost of the construction work, or the timing of payments therefore [*sic*]. This may delay final closing. If Borrower and the general contractor enter into arbitration, litigation, or both, the delay may be excessive. It may be impossible to reach agreement in order to complete final closing. Such delays may cause Lender and Borrower to ask HUD to finally endorse the Note even without the full participation of the general contractor, because the cost of continuing to incur extension or other fees and Lender's need to convert the underlying financing of the mortgage loan to permanent status.

Section. 1.17(B) of the HUD Guide contains a procedure for final endorsement despite such litigation:

> B. <u>Closing Without General Contractor</u>. If both the HUB Director and HUD Closing Attorney, each in his or her own discretion, agree, the parties may proceed to

final closing without the participation of the general
contractor if the following conditions are met:

1. Cost certification must have been satisfactorily
   completed by all parties required [*sic*] subject to
   this requirement.
2. The remaining mortgage loan proceeds must be placed
   in escrow pending the outcome of the dispute.
3. The title company must issue affirmative title
   insurance coverage over any liens that are in place
   related to the dispute.
4. There must be a mechanism in place for eventual
   resolution of the dispute or termination of the
   escrow that is satisfactory to HUD, such as
   litigation that does not involve HUD.

So, for the loan to proceed to final endorsement despite the
Broadmoor litigation, all of the requirements set out in Section
1.17(B) had to be met. The parties dispute whether those conditions
could have been met, but they agree that final endorsement did not
occur by way of Section 1.17(B).

The Broadmoor litigation settled in March 2019, and final
endorsement occurred around the same time.

As that dispute resolved, another emerged. Because final
endorsement did not occur by August 31, 2018, Bellwether invoked
the extension-fee agreement and demanded fees from Jaye, Morgan,
and Mirus. Bellwether said the borrowers owed $39,441 per period
for the monthly periods beginning on September 1 and October 1 and
$78,881 per period for the monthly periods beginning on November
1, December 1, January 1, February 1, and March 1. Bellwether

received a fraction of what it claimed: the borrowers made just two $39,441 payments, for the monthly periods beginning September 1 and October 1. The borrowers declined to pay the $354,965 in extension fees that allegedly accrued during the monthly periods from November 1 to March 1. So Bellwether sued.

In its one-count complaint, filed in May 2019, Bellwether alleged that Jaye and Morgan breached the extension-fee agreement by failing to pay $354,965 in extension fees. For reasons unexplained, Bellwether did not sue Mirus——the company owned by Jaye and Morgan and also bound by the extension-fee agreement. But Mirus soon entered the fray.

In October 2019, Mirus filed a separate suit against Bellwether; it too arose from the extension-fee agreement. See Eastern District of Louisiana Civil Action No. 19-13058. Mirus sued Bellwether for: (1) breach of contract; (2) a declaratory judgment that the extension-fee agreement is unenforceable; (3) payment of a thing not owed; and (4) negligence.

For its contract claim, Mirus alleged that Bellwether breached implied obligations arising from the extension-fee agreement by "unreasonably and wrongfully delay[ing]" final endorsement. Mirus said it gave Bellwether everything it needed to proceed to final endorsement by August 31, 2018, but Bellwether failed to do so.

Mirus based its negligence claim on similar allegations——that Bellwether "unreasonably impede[d] Mirus' selection of management" and "unreasonably cause[d] rescission of and delaying HUD's approval" of project management.

For its declaratory-judgment claim, Mirus alleged that the extension-fee agreement is unenforceable because (a) it provides for "liquidated penalty damages" that are "manifestly unreasonable" under Civil Code Article 2012, and (b) Bellwether failed to place Mirus in default.

Finally, for its claim for payment of a thing not owed, under Civil Code Article 2299, Mirus alleged that Bellwether is "bound to restore" the payments Mirus made under the allegedly unenforceable extension-fee agreement.

Meanwhile, in the original lawsuit, Jaye and Morgan counterclaimed against Bellwether for breach of contract and a declaratory judgment that the extension-fee agreement is unenforceable. The contract and declaratory-judgment counterclaims mirrored the claims Mirus brought in Eastern District of Louisiana Civil Action No. 19-13058.

In both lawsuits, Bellwether moved to dismiss for failure to state a claim. See FED. R. CIV. P. 12(b)(6). The Court denied the motions, in part, and held that: (1) Jaye, Morgan, and Mirus stated a claim that Bellwether breached its Civil Code Article 1772-

derived obligation not to prevent the suspensive condition of final endorsement from occurring; (2) Jaye, Morgan, and Mirus stated a claim for a declaratory judgment that the extension-fee agreement is unenforceable because it imposes damages "manifestly unreasonable" within the meaning of Civil Code Article 2012; (3) Mirus stated a claim for payment of a thing not owed under Civil Code Article 2299; and (4) Mirus stated a negligence claim. See Order and Reasons of 12/11/19.

Bellwether's Rule 12 motions revealed the legal and factual overlap between the lawsuits. Based on that overlap, the Court consolidated the lawsuits in November 2019. See Order and Reasons of 11/19/19. The Court concluded that the lawsuits arose from the same commercial mortgage loan and turned, principally, on the same legal question: Is the extension-fee agreement enforceable?

Now, the borrowers move for partial summary judgment against Bellwether, and Bellwether moves for summary judgment against the borrowers.

I.

Summary judgment is proper if the record discloses no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty

8

Lobby, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit." Id. at 248.

If the non-movant will bear the burden of proof at trial, the movant "may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." In re La. Crawfish Producers, 852 F.3d 456, 462 (5th Cir. 2017) (citation omitted).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See Anderson, 477 U.S. at 248. Nor do "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation[.]" Brown v. City of Houston, Tex., 337 F.3d 539, 541 (5th Cir. 2003). Ultimately, to avoid summary judgment, the non-movant "must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 387 (5th Cir. 2007).

In deciding whether a fact issue exists, the Court views the facts and draws all reasonable inferences in the light most favorable to the non-movant. See Midwest Feeders, Inc. v. Bank of Franklin, 886 F.3d 507, 513 (5th Cir. 2018). The Court "resolve[s] factual controversies in favor of the nonmoving party," but "only where there is an actual controversy, that is, when both parties

have submitted evidence of contradictory facts." <u>Antoine v. First Student, Inc.</u>, 713 F.3d 824, 830 (5th Cir. 2013) (citation omitted).

On cross-motions for summary judgment, the Court views each motion separately and asks, as to each, whether the movant has met the Rule 56(a) standard. <u>See</u> <u>Shaw Constructors v. ICF Kaiser Engr's, Inc.</u>, 395 F.3d 533, 538-39 (5th Cir. 2004) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998)).

## II.

Jurisdiction is based on diversity, so the Court applies the substantive law of the forum, Louisiana. <u>See</u> <u>Boyett v. Redland Ins. Co.</u>, 741 F.3d 604, 607 (5th Cir. 2014) (citing <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938)). Because Louisiana choice-of-law rules are substantive, they apply here. <u>See</u> <u>Weber v. PACT XPP Tech., AG</u>, 811 F.3d 758, 770 (5th Cir. 2016) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496-97 (1941)). Louisiana's choice-of-law rules require the Court to honor a contractual choice-of-law provision, except to the extent the law chosen "contravenes the public policy of the state" whose law would otherwise apply. LA. CIV. CODE art. 3540.

Section 5(d) of the extension-fee agreement contains a choice-of-law provision; it calls for the application of Louisiana

contract-interpretation law. Neither side contends that the application of Louisiana law "contravenes the public policy of the state" whose law would otherwise apply. LA. CIV. CODE art. 3540. So the Court honors the parties' choice, applies Louisiana law, and turns to the cross-motions for summary judgment.

III.

For the first cross-motion, Bellwether moves for summary judgment: (A) dismissing the claims the borrowers bring against it; and (B) awarding it damages on its claims for breach of contract against the borrowers. The Court considers dismissal before damages.

A.

In the first part of its two-part motion, Bellwether seeks summary judgment dismissing the claims of Jaye, Morgan, and Mirus. Those claims are: (1) a claim for a declaratory judgment that the extension-fee agreement is unenforceable; (2) a claim for payment of a thing not owed; (3) a claim for breach of implied obligations arising from the extension-fee agreement; and (4) a claim for negligence.[2] The Court considers each in turn.

---

[2] Jaye and Morgan originally asserted counterclaims for: breach of contract; breach of the duty of good faith and fair dealing; violations of the Louisiana Unfair Trade Practices and Consumer Protection Law, LA. REV. STAT. §§ 51:1401 — 51:1430; a declaratory judgment; and attorney's fees. The Court dismissed the

1.

The first claim Bellwether challenges is the one for a declaratory judgment that the extension-fee agreement is unenforceable as a matter of Louisiana law.

The Declaratory Judgment Act allows a federal court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

Invoking the Declaratory Judgment Act, the borrowers request a judgment declaring the stipulated damages provision of the extension-fee agreement unenforceable. Bellwether moves for summary judgment, contending the provision is enforceable for three reasons: (1) it is not a stipulated damages provision at all; (2) even if it were, it is enforceable as the product of arms-length negotiations between sophisticated parties; and (3) it "reasonably approximates" Bellwether's damages in the event of breach.

---

attorney-fee counterclaim on the pleadings, and Jaye and Morgan dropped their claims for breach of the duty of good faith and fair dealing and violation of the Louisiana Unfair Trade Practices and Consumer Protection law when they filed an amended answer that did not assert them. See King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) (citing Boelens v. Redman Homes, Inc., 759 F.2d 504, 508 (5th Cir. 1985)). So the Court need not address Bellwether's arguments for dismissal of these claims.

Bellwether's arguments center on the Louisiana law of stipulated damages. At first glance, that law appears clear: The Civil Code creates a general rule respecting stipulated damages provisions, LA. CIV. CODE art. 2005, and an exception allowing judicial modification of them, LA. CIV. CODE art. 2012. The general rule permits parties to "stipulate damages to be recovered in case of nonperformance, defective performance, or delay in performance[.]" LA. CIV. CODE art. 2005. The exception allows a court to modify a stipulated damages provision if it is "so manifestly unreasonable as to be contrary to public policy." La. Civ. Code art. 2012. Simple enough.

But the case literature proves complicated. One line of cases calls for closer consideration of stipulated damages provisions and urges courts to ask whether such provisions "reasonably approximate" the obligee's loss in the event of a breach. See, e.g., Keiser v. Catholic Diocese of Shreveport, Inc., 38,797, p. 9 (La. App. 2d Cir. 8/18/04); 880 So. 2d 230, 236.[3] Another line,

---

[3] The cases composing this line are more numerous and of more recent vintage. See Prof'l Fluid Servs., LLC v. Norsk Bronnservice AS, 2017-920, p. 6 (La. App. 3d Cir. 4/25/18); 245 So. 3d 47, 52, writ denied, 2018-0869 (La. 10/29/18); 254 So. 3d 120; Plaquemines Parish Gov't v. River/Road Constr., Inc., 2001-2222, p. 18 (La. App. 4th Cir. 8/28/02); 828 So. 2d 16, 28; Mobley v. Mobley, 37,364, p. 4-6 (La. App. 2d Cir. 8/20/03); 852 So. 2d 1136, 1139-40; Carney v. Boles, 25,905, p. 6-7 (La. App. 2d Cir. 9/21/94); 643 So. 2d 339, 343-44; Philippi v. Viguerie, 606 So. 2d 577, 579-

however, cautions courts against comparing the stipulated amount with the obligee's expected damages. See, e.g., American Totalisator Co. v. Fair Grounds Corp., 3 F.3d 810, 815 (5th Cir. 1993).[4] The parties dispute which line controls.

The first line coheres with Civil Code Article 2012, which allows a court to modify stipulated damages that are "so manifestly unreasonable as to be contrary to public policy." LA. CIV. CODE art. 2012. Of course, a court cannot decide if a stipulated damages provision is "manifestly unreasonable" without comparing the stipulated amount to the obligee's expected or actual damages. See Saul Litvinoff, 6 LA. CIV. L. TREATISE, Law Of Obligations § 13.18 (2d ed.). The Court has not found, and Bellwether has not identified, another means of gauging the reasonableness of a stipulated damages provision.

---

80 (La. Ct. App. 5th Cir. 1992); Am. Leasing Co. of Monroe, Inc. v. Lannon E. Miller & Son, 469 So. 2d 325, 328-29 (La. Ct. App. 2d Cir. 1985); John Jay Esthetic Salon, Inc. v. Woods, 377 So. 2d 1363, 1367 (La. Ct. App. 4th Cir. 1979); Preis v. Daily, --- So. 3d ---; 2019-700, (La. App. 3d Cir. 3/25/20); 2020 WL 1457687, at *4-7; Util. Constructors, Inc. v. Perez, No. 15-4675, 2016 WL 5801363, at *5-6 (E.D. La. Oct. 5, 2015).

[4] See also Pembroke v. Gulf Oil Corp., 454 F.2d 606, 611 (5th Cir. 1971); Ball Marketing, Inc. v. Sooner Refining Co., 422 So. 2d 582, 585-86 (La. Ct. App. 3d Cir. 1982); Maloney v. Oak Builders, Inc., 235 So. 2d 386, 390 (La. 1970); Lama v. Manale, 50 So. 2d 15, 17 (La. 1950).

14

Instead, Bellwether urges the Court to apply the all-deference, all-the-time approach from the second line of cases. <u>See</u>, <u>e.g.</u>, <u>Lama v. Manale</u>, 50 So. 2d 15, 17-18 (La. 1950). Courts cannot consider the reasonableness of stipulated damages provisions, these authorities instruct, because "parties to a contract generally have the *unqualified* right to stipulate for any amount of liquidated damages in the event of a breach." <u>Pembroke v. Gulf Oil Corp.</u>, 454 F.2d 606, 611 (5th Cir. 1971) (emphasis added).

But that is not the law. <u>See</u>, <u>e.g.</u>, <u>Plaquemines Parish Gov't v. River/Road Const., Inc.</u>, 2001-2222, p. 18-19 (La. App. 4th Cir. 8/28/02); 828 So. 2d 16, 28-29 (reversing trial court for failing to analyze the reasonableness of a stipulated damages provision); <u>Am. Leasing Co. of Monroe,</u>, 469 So. at 329 ("When a stipulated damages provision is enforced, the court *must* determine the reasonableness of the amount[.]") (emphasis added).

What is more, this hands-off approach clashes with the Civil Code: The cases applying the approach purport to preclude the reasonableness analysis the Civil Code plainly permits. <u>Compare</u> <u>Pembroke</u>, 454 F.2d at 611 (declaring, without citation, it "well settled" that parties enjoy the "unqualified right to stipulate for any amount of liquidated damages") <u>with</u> La. Civ. Code art. 2012 (allowing judicial modification of stipulated damages provisions

15

that are "so manifestly unreasonable as to be contrary to public policy") and Revision Comment (c) (1984) to LA. CIV. CODE art. 2005 ("A stipulated damages clause is given effect *if the court deems it to be a true approximation of actual damages.*") (emphasis added).

The hands-off approach also ignores relevant scholarship. For example, a professor of the Louisiana State University Law Center, writing in 1983, considered it "clear from the jurisprudence that the parties must have made a good faith effort to reasonably estimate the probable loss that a breach would cause." Ronald L. Hersbergen, <u>Unconscionability: The Approach of the Louisiana Civil Code</u>, 43 LA. L. REV. 1315, 1419 (1983). The late Professor Saul Litvinoff concurred; he explained that courts *must* modify stipulated damages provisions that are "manifestly unreasonable" in light of the obligee's expected or actual damages:

> [T]he basic principle of no modification of the stipulated damages *must* yield when such damages are manifestly unreasonable. It should be clear that whether or not such damages are unreasonable is a determination that will result from contrasting the evaluation contained in the pertinent clause with an evaluation of the real loss sustained by the aggrieved obligee.

Litvinoff, 6 LA. CIV. L. TREATISE, at § 13.18 (emphasis added).

Because the text of the Civil Code supports the first line of authority and cast doubt on the second, the Court applies the first line. From that line, three principles emerge.

16

First, the aim of a stipulated damages provision is "to fix the measure of damages in advance and to constrain the timely performance of the principal obligation." James Const. Grp., L.L.C. v. State ex. Rel. Dept. of Transp. & Dev., 2007-0225, p. 12 (La. App. 1st Cir. 11/2/07); 977 So. 2d 989, 997. And stipulated damages provisions cannot "serve as a vehicle to recover punitive, as opposed to compensatory[,] damages." Philippi v. Viguerie, 606 So. 2d 577, 579 (La. Ct. App. 5th Cir. 1992); see also Litvinoff, 6 La. Civ. L. Treatise, at § 13.17 ("[P]arties may not avail themselves of a stipulated damages clause as a subterfuge to allow either one or both of them the recovery of damages that are punitive rather than compensatory.").

Second, stipulated damages "should reasonably approximate the obligee's loss in the event of a breach[.]" Keiser, 880 So. 2d at 236 (citing Am. Leasing Co. of Monroe, 469 So. 2d at 325. To decide if a stipulated damages provision is reasonable, the Court asks "whether the parties attempted to approximate the actual damages in confecting the agreement." Keiser, 880 So. 2d at 236. The provision is enforceable if they did and unenforceable if they did not. Id.

Third, the stipulated amount is presumed reasonable, and the party that says otherwise must rebut the presumption. James Const. Grp., 977 So. 2d at 998. To do so, the party must show that the

provision is "so manifestly unreasonable as to be contrary to public policy." LA. CIV. CODE art. 2012.

With these principles in mind, the Court turns to Bellwether's arguments for dismissal of the borrowers' claims for a declaratory judgment that the extension-fee agreement is unenforceable.

First, Bellwether contends that Civil Code Article 2012 does not even apply. So, Bellwether says, the Court need not subject the extension-fee agreement to any scrutiny. That is because, according to Bellwether, the extension-fee agreement does not provide for "stipulated damages"; it merely grants Bellwether "the option" to grant the borrowers an extension in exchange for the payment of monthly fee. The Court disagrees.

To start, Bellwether's argument misreads the extension-fee agreement. That agreement does not give Bellwether "the option" to extend the deadline for achieving final endorsement in exchange for a fee; it makes the borrowers "liable and obligated to pay to [Bellwether] a monthly extension fee" for each month final endorsement was delayed beyond August 31, 2018. It therefore requires the borrowers to pay an extension fee, even if Bellwether refuses to grant an extension.

What is more, Bellwether's argument fails to consider the text of the Civil Code. Article 2005 permits parties to "stipulate the damages to be recovered in case of nonperformance, defective

performance, or delay in performance of an obligation." That is exactly what the parties did here; they agreed that the borrowers would pay Bellwether fixed monthly sums for each month final endorsement was delayed beyond August 31, 2018. Those sums supposedly supplied the measure of Bellwether's damages in the event the borrowers breached their obligation to timely achieve final endorsement. So the extension-fee agreement is an attempt to "stipulate . . . damages" within the meaning of Civil Code Article 2005 and is therefore subject to Civil Code Article 2012. Having rejected Bellwether's first argument, the Court turns to its second.

For its second argument, Bellwether says that the extension-fee agreement is enforceable as the product of "arms-length negotiations between sophisticated parties." In so arguing, Bellwether invites the Court to hold that Civil Code Article 2012 applies only when there are disparities in bargaining power. The Court declines the invitation.

Civil Code Article 2012 is not as limited as Bellwether says. Article 2012 is clear: Before a court modifies a stipulated damages provision, it must find that the stipulated damages "are so manifestly unreasonable as to be contrary to public policy." LA. CIV. CODE art. 2012. A court need not also find a gap in bargaining power. See, e.g., Plaquemines Parish Gov't, 828 So. 2d at 29

(reversing trial court for failing to consider the reasonableness of stipulated damages provision in arms-length transaction between construction company and parish government); <u>Philippi</u>, 606 So. 2d at 580 (affirming trial court's modification of stipulated damages provision in contract between "sophisticated businessmen with equal bargaining power"). Accordingly, Bellwether's second argument lacks merit, and the Court turns to its third.

For its third argument, Bellwether contends that the stipulated damages provision is enforceable, as a matter of law, because the stipulated amount "reasonably approximates" the damages Bellwether would suffer if final endorsement was delayed. According to Bellwether, the stipulated amount——0.125% of the mortgage note ($39,441) each month for the first three months of delay and 0.25% of the mortgage note ($78,881) each month thereafter——approximates: (a) the amounts it was contractually obligated to pay its investor, Lancaster Pollard, due to the delay; plus (b) unspecified "additional costs" Bellwether would incur in "managing" and "servicing" the loan during the delay. To evaluate Bellwether's argument, the Court turns first to the contract between Bellwether and Lancaster Pollard.

That contract was styled a "trade agreement" and signed on May 26, 2016——just thirty-six days before Bellwether and the borrowers entered into the extension-fee agreement. Under the

20

trade agreement, Bellwether agreed to sell mortgage-backed securities to Lancaster Pollard. Bellwether promised to deliver the securities by January 31, 2019, "the last day of the month in which the twenty-ninth (29th) monthly anniversary of the Initial GNMA CLC occurs[.]" Bellwether could extend that delivery date by paying Lancaster Pollard a monthly fee of 0.125% of the $31,522,100 delivery amount, or $39,440.13. And it did so: Bellwether made three $39,440.13 payments——on January 1, 2019, February 2, 2019, and March 1, 2019——for a total of $118,320.39. So the delay in final endorsement cost Bellwether $118,320.39, plus "additional costs" for "managing" and "servicing" the loan. Bellwether appears to contend that the stipulated damages provision of the extension-fee agreement "reasonably approximates" these amounts.[5] The Court disagrees.

First, consider the chasm between the stipulated amounts and the amount Bellwether was contractually obliged to pay Lancaster

---

[5] Bellwether does not apply the "reasonably approximate" standard that springs from the case literature. Bellwether instead says that "the Extension Fee compensates Bellwether for actual costs it incurs as a result of delays in the Final Endorsement date." But the "actual costs" are unstated. Bellwether adds that the extension-fee arrangement is "commonplace . . . in the commercial lending industry." That is not the standard, though; "commonplace" or not, the stipulated amount should "reasonably approximate" Bellwether's actual damages. There must be some "fit" between the figures, and Bellwether's wayward contentions do not help the Court find it.

Pollard. For the months of January, February, and March 2019, the stipulated amount is $78,881 per month——*double* Bellwether's monthly payment obligation to Lancaster Pollard. And the total stipulated amount——$433,847—is more than *triple* the amount Bellwether was contractually obliged to pay Lancaster Pollard. These figures are multiples of Bellwether's actual damages——not "reasonable approximations" of them.[6]

Second, consider the timing of Bellwether's contractual obligation to pay Lancaster Pollard. Until January 1, 2019, Bellwether owed no payments to Lancaster Pollard. By then, however, the stipulated damages provision required the borrowers to pay Bellwether $197,204. So the stipulated damages provision required the borrowers to pay Bellwether nearly $200,000 when Bellwether's actual damages were $0.

Third, consider the formulaic fee structure of the extension-fee agreement. It requires the borrowers to pay Bellwether 0.125% of the mortgage note ($39,441) each month for the first three months of delay and 0.25% of the mortgage note ($78,881) each month thereafter. Why does the stipulated amount double after the third

---

[6] Stipulated damages may of course "exceed, to some degree[,]" the obligee's "reasonably approximate[d]" actual damages. <u>Am. Leasing Co. of Monroe</u>, 469 So. 2d at 329. But the Court has not found, and Bellwether has not invoked, any authority allowing stipulated damages of double or triple the obligee's anticipated damages.

22

month of delay? Bellwether provides no satisfactory answer. Its trade agreement with Lancaster Pollard is of little help; nothing in it supports a finding that Bellwether's actual damages somehow doubled beginning in December 2019.

Bellwether has not met its Rule 56(a) burden. On the contrary, the facts and law raised in connection with Bellwether's motion show that the stipulated damages provision of the extension-fee agreement is unenforceable as a matter of Louisiana law because it is "so manifestly unreasonable as to be contrary to public policy." LA. CIV. CODE art. 2012. As explained, the stipulated amounts do not "reasonably approximate" Bellwether's actual damages in the event of breach. Keiser, 880 So. 2d at 236. And it is plain that the parties did not even "attempt[] to approximate" those damages in confecting the stipulated damages provision. Id.; Am. Leasing Co. of Monroe, Inc., 469 So. 2d at 329 (demanding a determination of whether the parties "truly attempted to reasonably approximate actual damages" in confecting the provision); Mobley, 852 So. 2d at 1140 (same). To be sure, the stipulated amounts "do not bear any reasonable relation," Carney, 643 So. 2d at 343, to Bellwether's actual damages——damages Bellwether knew with reasonable certainty at the time of contracting. A provision with these characteristics is not compensatory; it is punitive.

Accordingly, the Court finds that the stipulated damages provision of the extension-fee agreement is unenforceable, and the Court denies Bellwether's motion for summary judgment on the borrowers' declaratory-judgment claims.[7]

2.

Bellwether next moves for summary judgment on Mirus' claim for payment of a thing not owed.

In Louisiana, "[a] person who has received a payment or a thing not owed to him is bound to restore it to the person from whom he received it." LA. CIV. CODE art. 2299. "A thing is not owed when it is paid or delivered for the discharge of an obligation that does not exist." LA. CIV. CODE art. 2300.

Mirus sued Bellwether under Civil Code Article 2299 to recoup the money it paid under the stipulated damages provision of the extension-fee agreement. Because the stipulated damages provision

---

[7] Critically, Bellwether does not argue——as a fallback position should the Court find against it——that the Court should modify the stipulated amount to a sum that reasonably approximates its anticipated losses. So the Court does not consider whether it should reduce the stipulated amount rather than declare the entire stipulated damages provision unenforceable. See, e.g., Carney, 643 So. 2d at 344(reducing stipulated sums); Philippi, 606 So. 2d at 580(affirming trial court's reduction of stipulated sums); John Jay Esthetic, 377 So. 2d at 1368 (declining to enforce stipulated damages provision and remanding for presentation of evidence of actual damages).

is unenforceable, Mirus reasons, the payments were not "owed," and Bellwether is "bound to restore" them. LA. CIV. CODE art. 2299.

Bellwether disagrees. It says it is entitled to summary judgment on this claim for the same reason it is entitled to summary judgment on the declaratory-judgment claim: the stipulated damages provision is enforceable as a matter of law. Because the Court has rejected that argument, the Court rejects this one, too. The provision is not enforceable, and Bellwether cannot show that Mirus actually "owed" payments under the unenforceable provision. LA. CIV. CODE art. 2299; see also Bell South Telecomm., LLC v. City of Orleans, 31 F. Supp. 3d 819, 831 (E.D. La. 2014) (payment made to city in compliance with an ordinance was never "owed" because ordinance was unenforceable from the start). The Court therefore denies Bellwether's motion for summary judgment on Mirus' Civil Code Article 2299 claim.

3.

Bellwether next moves for summary judgment on the borrowers' claims that it breached implied obligations arising from the extension-fee agreement under Civil Code Article 1772.

Under Louisiana law, a breach-of-contract claim has three elements: "'(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the

obligee.'" IberiaBank v. Broussard, 907 F.3d 826, 835 (5th Cir. 2018) (quoting Favrot v. Favrot, 1108-09, pp. 14-15 (La. App. 4th Cir. 2011); 68 So. 3d 1099, 1108-1109).

An obligation is "conditional" if it depends on an "uncertain event." LA. CIV. CODE art. 1767. It is "suspensive" if it "may not be enforced until the uncertain event occurs." Id. Louisiana law regards a suspensive condition as "fulfilled" when "it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment." LA. CIV. CODE art. 1772.

Civil Code Article 1772 embraces a "frustration" or "prevention of performance" principle: One contracting party has an implied obligation not to do anything that prevents the other from performing his obligation. Orleans Parish Sch. Bd. v. Lexington Ins. Co., 2012-1686, p. 16 (La. App. 4 Cir. 6/5/13); 118 So. 3d 1203, 1216 (citing In re Crutcher-Tufts Res., Inc., 504 F.3d 535, 542 (5th Cir. 2007)). The principle flows from "the premise [that] one should not be able to take advantage of his own wrongful act." Gibbs Const. Co. v. Thomas, 500 So. 2d 764, 766 (La. 1987). It applies to both obligor and obligee. LA. CIV. CODE art. 1772 cmt. a.

If the obligee's fault prevents a suspensive condition from becoming "fulfilled," the obligor may sue for damages. See LA. CIV. CODE art. 1772 cmt. c; 5 LA. CIV. L. TREATISE, Law of Obligations §

26

5.9 (2d ed.). The obligee conceptually has breached his implied contractual obligation. <u>See</u> LA. CIV. CODE art. 2054; <u>Certain Underwriters at Lloyd's, London v. Sea-Lar Mgmt., Inc.</u>, 2000-1512, p. 8 (La. App. 4 Cir. 5/9/01); 787 So. 2d 1069, 1076.

Here, the borrowers sued Bellwether for breaching implied obligations arising from the extension fee agreement by "unreasonably and wrongfully delay[ing]" final endorsement. Bellwether says it is entitled to summary judgment because it did not cause the delay; the Broadmoor litigation did.

The Broadmoor litigation complicated the final endorsement process, Bellwether explains, because the HUD Guide contains only a narrow procedure for closing without the general contractor's participation. Bellwether says that it asked Mirus if Mirus "wanted to use that procedure," but Mirus failed to respond.

The borrowers rejoin that fact issues preclude summary judgment, and the Court agrees. On this record, it is impossible to assign blame for the delay in final endorsement. The borrowers point to facts——taken as true and viewed in their favor——sufficient to support a finding that Bellwether caused, at least in part, the delay.

The borrowers' theory finds support in the declaration of Kristi Morgan. Morgan attests that: (1) following a call with a Bellwether employee in July 2017, it became "apparent" that

Bellwether encouraged HUD to rescind its approval of Syncromatic Management, LLC as the management agent for the project, necessitating the selection of a replacement and delaying final endorsement; (2) Bellwether wrongly withheld money from payments owed to the general contractor, Broadmoor, for builders risk insurance, contributing to the filing of the Broadmoor litigation; (3) Bellwether failed to pay "undisputed invoice amounts," stripping Mirus of the funds it needed to pay Broadmoor's draw request and sparking the Broadmoor litigation; and (4) Bellwether "was not cooperative in establishing [the] escrow" needed to proceed to final endorsement during a contractor dispute, in accordance with Section 1.17(B)(2) of the HUD Guide.

A jury could find that any of these acts amounts to a breach of Bellwether's Civil Code Article 1772-derived obligation not to take any action to prevent the suspensive condition of final endorsement from occurring. See, e.g., Gibbs Const. Co., 500 So. 2d at 766; Orleans Parish Sch. Bd., 118 So. 3d at 1216. The Court therefore denies Bellwether's motion for summary judgment on the borrowers' breach-of-contract claims.

4.

Bellwether next moves for summary judgment dismissing Mirus' claim that it negligently delayed final endorsement.

The source of negligence liability in Louisiana is Civil Code Article 2315, which instructs that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." LA. CIV. CODE art. 2315. Courts use a duty-risk approach to decide whether to impose negligence liability. Lemann v. Essen Lane Daiquiris, Inc., 2005-1095, p. 7 (La. 3/10/06); 923 So. 2d 627, 632.

To recover under that approach, the plaintiff must prove five elements: (1) the defendant had a duty to conform its conduct to a specific standard; (2) the defendant's conduct failed to conform to that standard; (3) the defendant's substandard conduct was cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. Audler v. CBC Innovis, Inc., 519 F.3d 239, 249 (5th Cir. 2008) (citing Lemann, 923 So. 2d at 633).

Bellwether contends that is entitled to summary judgment because Mirus cannot prove damages caused by Bellwether's alleged negligence. The Court disagrees.

Consider, again, the declaration of Kristi Morgan. Morgan attests that, as a result of the Bellwether-engineered rescission of Syncromatic as project management agent, Mirus incurred $360,206.97 in "management and lease up fees," plus unspecified "expenses for staff time." Whether these fees and expenses were

caused by Bellwether's negligence is a factual dispute for the jury. The Morgan declaration aside, many of the same genuine disputes of material fact that precluded summary judgment on the breach-of-contract claims preclude summary judgment on this claim. The Court therefore denies Bellwether's motion for summary judgment on Mirus' negligence claim.

Having denied the first component of Bellwether's motion for summary judgment——dismissal of the borrowers' claims——the Court turns to the second: Bellwether's request for an award of damages on its claims for breach of contract.

B.

In the second part of its two-part motion, Bellwether seeks summary judgment awarding it damages on its claims for breach of contract. But the Court has held that the stipulated damages provision of the extension-fee agreement is unenforceable. See § III(A)(1), supra. So Bellwether cannot recover damages against the borrowers for breaching the unenforceable stipulated damages provision. The Court therefore denies this component of Bellwether's motion for summary judgment.

IV.

For the second cross-motion, Jaye and Morgan move for partial summary judgment: (A) declaring the stipulated damages provision of the extension-fee agreement unenforceable as a matter of Louisiana law; and (B) dismissing Bellwether's breach-of-contract claims.

A.

First, Jaye and Morgan ask the Court to hold that the stipulated damages provision is unenforceable. The Court has so held. See § III(A)(1), supra. Accordingly, for the reasons given in § III(A)(1) of this Order and Reasons, the Court grants Jaye and Morgan's motion for partial summary judgment on the enforceability of the stipulated damages provision.

B.

Second, Jaye and Morgan move for summary judgment dismissing Bellwether's claims for breach of contract. Bellwether sued Jaye and Morgan for breaching portions of the extension-fee agreement that this Court held unenforceable in § III(A)(1) of this Order and Reasons. Because the stipulated damages provision of the extension-fee agreement is unenforceable as a matter of Louisiana law, Bellwether cannot succeed on its claims against Jaye and Morgan for breach of that provision. See, e.g., Ramos v. Liberty Bank and Trust Co., 2018-0612, p. 2 (La. App. 4th Cir. 12/19/18);

31

262 So. 3d 917, 918 (breach-of-contract claim requires an enforceable contract).

Bellwether contends, however, that summary judgment is inappropriate, even if the Court concludes (as it has) that the stipulated damages provision is unenforceable. Bellwether says it still has claims against Jaye and Morgan for breaching the principal obligation of the extension-fee agreement——the obligation to proceed to final endorsement by August 31, 2018.

It is of course true, as Bellwether says, that "[n]ullity of the stipulated damages clause does not render the principal obligation null." LA. CIV. CODE art. 2006. But Bellwether did not sue the borrowers for breaching the "principal obligation" of the extension-fee agreement; it sued them for breaching the stipulated damages provision only. The Court declines to deny summary judgment on the basis of a hypothetical claim Bellwether has not brought.[8]

---

[8] Because the amendment deadline expired long ago, Rule 16(b) would govern any request to amend. See Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc., 892 F.3d 719, 735 (5th Cir. 2018). The "more liberal standard of Rule 15(a)" would not apply until Bellwether showed "good cause to modify the scheduling order[.]" S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA, 315 F.3d 533, 536 (5th Cir. 2003). Bellwether has not moved for leave to amend its complaint out of time, and its summary judgment papers do not contain the facts the Court needs to make an informed good-cause determination. See Innova Hosp., 892 F.3d at 735 (calling for consideration of four factors in deciding whether to allow an untimely amendment). Consequently, the Court takes no position on the question whether Bellwether can make the

Accordingly, the Court grants Jaye and Morgan's motion for partial summary judgment dismissing the breach-of-contract claims Bellwether brings against them.

V.

For the third and final cross-motion, Mirus moves for partial summary judgment: (A) declaring the stipulated damages provision of the extension-fee agreement unenforceable as a matter of Louisiana law; and (B) ordering Bellwether to "restore" to Mirus the $78,882 in fees that Mirus paid Bellwether under the stipulated damages provision.

A.

First, Mirus moves for summary judgment declaring the stipulated damages provision of the extension-fee agreement unenforceable as a matter of Louisiana law. The Court has held that the provision is unenforceable. See § III(A)(1), supra. So, for the reasons given in § III(A)(1) of this Order and Reasons, the Court grants Mirus' motion for partial summary judgment on the enforceability of the stipulated damages provision.

---

showing required to amend its complaint out of time to assert the claims it references in § IV of its brief in opposition to Jaye and Morgan's motion for partial summary judgment.

33

B.

Second, Mirus moves for summary judgment on its effort to recoup, under Civil Code Article 2299, the money it paid Bellwether under the stipulated damages provision of the extension-fee agreement. Because that provision is unenforceable, Mirus reasons, the payments were not "owed," and Bellwether is "bound to restore" them. LA. CIV. CODE art. 2299. Bellwether counters that, even if the provision is unenforceable, Bellwether need not "restore" the payments because Mirus made them voluntarily and with "full knowledge of the relevant facts[.]" The Court disagrees.

Bellwether invokes the voluntary payment doctrine, which holds that "'voluntary payments made with full knowledge of all the facts and not under duress may not subsequently be recovered, even though the amount so paid is not actually owed.'" Carter v. Montgomery Ward & Co., 413 So. 2d 309, 314 (La. Ct. App. 3d Cir. 1982) (quoting Whitehall Oil Co. v. Boagni, 217 So. 2d 707, 713-14 (La. Ct. App. 3d Cir. 1968) (Tate, J., dissenting)). But the 1996 amendment to Civil Code Article 2299 suggests that the doctrine does not apply to claims for payment of a thing not owed. See Revision Comment (b) (1996) to LA. CIV. CODE art. 2299 ("[T]he person who receives a thing or a payment not owed, whether knowingly or through error, must restore it to the person from whom he received it."). And the Fifth Circuit, invoking Revision Comment (b), has instructed that "[t]he right to reimbursement

34

conferred by [A]rticle 2299 exists regardless of whether such payment was made knowingly or through error." <u>Am. Intern. Specialty Lines Ins. Co. v. Canal Indem. Co.</u>, 352 F.3d 254, 273 (5th Cir. 2003). So too here.

Because Mirus' right to reimbursement of the $78,882 in extension fees that it paid Bellwether under the unenforceable stipulated damages provision "exists regardless of whether such payment was made knowingly or through error," the voluntary payment doctrine poses no impediment to Mirus' claim for payment of a thing not owed under Civil Code Article 2299.[9] <u>Am. Intern. Specialty Lines</u>, 352 F.3d at 273.

Accordingly, because the stipulated damages provision of the extension-fee agreement is unenforceable, the $78,882 in extension fees that Mirus paid were not "owed" to Bellwether, and Bellwether is "bound to restore" them to Mirus. LA. CIV. CODE art. 2299. The Court therefore grants Mirus' motion for partial summary judgment on its claim for payment of a thing not owed.

---

[9] The Fifth Circuit's nonprecedential opinion in <u>Sanders v. Washington Mut. Home Loans, Inc. ex rel Washington Mut. Bank</u>, 248 F. App'x 513 (5th Cir. 2007) (per curiam), is not to the contrary. The plaintiffs there——unlike the borrowers here——asserted no causes of action under Civil Code Article 2299. <u>See</u> <u>id.</u> at 517.

VI.

Accordingly, for the foregoing reasons, IT IS ORDERED: that Bellwether's motion for summary judgment is DENIED, Jaye and Morgan's motion for partial summary judgment is GRANTED, and Mirus' motion for partial summary judgment is GRANTED.


New Orleans, Louisiana, June 10, 2020

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE